**Susan M. BRACEY, Appellant,**

**v.**

**Michael G. BRACEY, Appellee.**

**No. 88–732.**

District of Columbia Court of Appeals.

Submitted March 5, 1991.

Decided April 16, 1991.

Susan Bracey and Michael Bracey filed briefs pro se.

Before STEADMAN and SCHWELB, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

On April 28, 1988, the trial court entered "Findings of Fact, Conclusions of Law and Judgment of Absolute Divorce," into which a Separation and Property Settlement Agreement (Agreement) entered into by the parties was incorporated by reference but not merged. The parties had separated in early 1979. Their son, then almost two years old, had subsequently spent two years (1981–83) in the custody of his father and the remaining time with his mother. At the divorce proceedings, several issues were raised and explored at length, includ-

ing visitation rights and a requested increase in the child support provision of $200 per month agreed to by the father in the Agreement.

The only issue on appeal is whether the trial court erred in its judgment that child support payments should commence under the Agreement on January 1, 1987, instead of July 1, 1986. Appellant's argument in support of the latter date is that the Agreement bears a date of June 4, 1986, and provides that child support will be payable "commencing on the first day of the month immediately following the date of this Agreement." The trial court, however, concluded that since in fact the Agreement was not finally agreed to until December 10, 1986, payments should begin on January 1, 1987.

■■■■ Both parties had the advice of counsel in entering into the Agreement and at trial. The trial court found that in the execution of the Agreement, there was no fraud, duress, concealment or overreaching.[1] It further found that the provision for child support at the time took into account the full needs of the child and adequately protected the child's best interests, and that the Agreement was "fair and reasonable under the circumstances."[2]

"[T]he law in this jurisdiction allows and indeed encourages the use of separation agreements to settle the financial affairs of spouses who are not able to maintain a harmonious marriage relationship." *Lanahan v. Nevius*, 317 A.2d 521, 523 (D.C. 1974). Accordingly, such agreements are generally enforced in accordance with their terms. "If the parties disagree on the meaning of their agreement, then the court must interpret it according to principles of contract law and the court's statutory responsibilities. . . . [W]here the trial court has resolved factual disputes regarding a contract between the parties, this court must treat these factual findings as presumptively correct, unless they are clearly erroneous or unsupported by the record." *Spencer v. Spencer, supra* note 2, 494 A.2d at 1286 (citation omitted).

■■■ Here, the trial court tacitly resolved the meaning of a provision which was arguably ambiguous; *viz.*, whether the "date of this Agreement" governing the beginning of child support payments was the date appearing in the Agreement itself or the date on which the Agreement was in fact finally made. It did so after a hearing that extended over three days of testimony and some 400 pages of transcript, in which the issue of the actual date of the Agreement and its effect on the child support provision, including the question of when payments were to begin, was specifically raised and thoroughly explored.

We recognize that a persuasive case can be made to the contrary, as the dissent ably sets forth. But there is nothing inherently implausible in a view that where in June, a party makes a counteroffer in contract negotiations that certain payments will begin "on the first day of the month following the date of this Agreement" and an acceptance of that counteroffer does not

---

1. The oddity as to the date apparently came about because of the unorthodox manner in which the negotiations took place. Signed copies of the proposed agreement were shipped back and forth between the parties, with pages removed and alternate pages inserted containing the desired provisions of the affected party. Among disputed provisions were child support and rights in South Carolina property.

2. Where a support agreement establishes a support arrangement which is inadequate in its inception to meet the child's foreseeable needs, the court has the power and responsibility to order *additional* child support. *Portlock v. Portlock*, 518 A.2d 116, 119 (D.C.1986). An originally adequate agreement can be modified if a party demonstrates a change of circumstances unforeseen when the Agreement was entered and which is substantial and material to the welfare and best interests of the child. *Spencer v. Spencer*, 494 A.2d 1279, 1287 (D.C.1985). The trial court here found that there had been no substantial increase in the child's expenses, which it set at $473. (The mother had no out-of-pocket expenses for housing costs because of an advantegeous rental arrangement taken into account in negotiating the Agreement.) The trial court further found that the net disposable income of the two parties was "relatively equivalent," and that the father was at the time financially able to pay only the agreed-upon amount of child support. The trial court here left open the possibility of future changes, noting that the present request for modification was "premature."

occur until December, the payments are intended to begin on January 1, even though the contract itself may bear a formal date of June 4 because of the peculiar manner in which the negotiations took place. Resolving such interpretative ambiguities is a trial court role and function. We simply cannot say that the judgment here was "clearly erroneous or unsupported by the record." D.C.Code § 17–305 (1989). *See Waverly Taylor, Inc. v. Polinger,* 583 A.2d 179, 182 (D.C.1990) (trial court interpreting ambiguous contract essentially acts as a finder of fact).

*Affirmed.*

SCHWELB, Associate Judge, dissenting:

The sole question before us is whether the father's obligation to pay child support in the amount of $200 per month to the mother for the support of their son, Alexander, who was nine at the time of the controversy and is now almost fourteen years of age, began in July 1986, as the mother contends, or in January 1987, as the father maintains. The trial court held that since the mother did not finally agree to the Separation and Property Settlement Agreement until December 1986, the father was not required to begin payments pursuant to its terms until the following month. In my opinion, however, the critical question is not when the Agreement became effective, but rather when the child support payments contemplated by it were to begin. There is much evidence, equity and common sense on the mother's side of that issue, and I do not think that what the majority characterizes as "tacit" findings on the part of the trial judge will support affirmance of the decision below.

The unorthodox history of the negotiations which led to the belated conclusion of the Agreement is summarized in the majority opinion. The first line of the preface or preamble describes the Agreement as having been "made this 4th day of June 1986" by "[the father] and [the mother]." Para-

graph 23 provides that the father shall pay the mother $200 per month "payable on the first day of each month commencing on the first day of the month following the date of this Agreement." Given the reference in the first sentence of the document to June 4, 1986, the first payment would become due, under a literal reading of the document, on July 1, 1986.[1]

The parties' pleadings lend further support to such a reading. The father prayed in his complaint, which was dated December 10, 1986, that "the terms of the Separation and Property Settlement Agreement of the parties, dated June 4, 1986, be incorporated and made a part of, but not merged in" any judgment of divorce. The mother requested identical relief in her answer, which was filed on February 9, 1987.

If the parties had intended that, as a result of the delay in reaching accord on the amount of support and in concluding the Agreement, the effective date of the child support obligation should be deferred from July 1986 to January 1987, they could easily have changed the date in the preamble from June 4, 1986 to December of that year. They did not do so, however, and it is questionable if the mother would have accepted the Agreement if such a change had been made. The father was willing to pay $200 per month beginning in July 1986, and he never took any steps to signify that he viewed the June 1986 date in the preamble, which was supposed to trigger the initiation of the child support obligation, as being no longer in effect. In light of that willingness, as reflected in the father's signature on June 9, 1986, it is somewhat incongruous to conclude that the parties intended *no* payments to be made during the second half of 1986. Moreover, as the Supreme Court cogently put it in *Noonan v. Bradley,* 76 U.S. (9 Wall.) 394, 407, 19 L.Ed. 757 (1869),

> where an instrument is susceptible of two constructions—the one working injustice and the other consistent with the

---

1. There is no reference in the Agreement to any date later than June 1986. The father signed the document on June 9, 1986. The mother had signed it on January 6, 1986. It is undisputed, however, that there was no agreement as to all terms on either of these dates.

right of the case—that one should be favored which standeth with the right.

I suggest that the father's construction does not fare well under the Supreme Court's approach. Basic principles of fairness and justice apply with particular force here, for this Agreement was not one for the sale of widgets. We are not dealing here with the kind of contract in which, if one party outwits the other during the course of arm's length bargaining, the court simply closes its eyes and says "too bad." Child support payments are for the benefit of the child, not the mother, and the child's interest is paramount. *Cooper v. Cooper*, 472 A.2d 878, 880 (D.C.1984) (per curiam). For many generations, court-ordered child support tended in many instances to be so inadequate that the non-custodial parent (most frequently the father) effectively preserved or improved his former station in life and standard of living, while the custodial parent (usually the mother) and the children were relegated to substantially less favorable circumstances than they had enjoyed when the family was intact. *See generally Fitzgerald v. Fitzgerald*, 566 A.2d 719, 724 (D.C.1989).[2] It was in order to import a greater measure of equity into the resolution of child support litigation, and to give children in single-parent homes a better break than they had theretofore received, that the Board of Judges of the Superior Court, and later the Council of the District of Columbia, adopted Child Support Guidelines, which now presumptively establish the proper level of support. *See Fitzgerald, supra*, 115 Daily Wash.L.Rptr. 1 (October 27, 1987) (Superior Court Guidelines, invalidated in *Fitzgerald*); D.C.Code § 16–916 (1990 Supp.) (Legislative Guidelines).

In the present case, the trial judge found that "[a]pplication of the Guideline results [in] an approximate range of support from $391.24 (22.3% at the lower end) to $453.30 (at 25.3% presumptive amount)." Although the $200 per month to which the mother ultimately agreed is roughly half of the Guideline amount, and perhaps even less, the trial judge found it to be "reasonable under the circumstances." Assuming, *dubitante*, that this finding was correct—and it is doubtful that the agreed amount and the Guideline can *both* be reasonable—$200 is surely about as parsimonious a monthly payment as one could countenance in this case without crossing the line to inadequacy. The mother obviously agreed to it reluctantly, and only because she thought she had to yield under pressure in order to get any appreciable amount any time reasonably soon. An interpretation of the Agreement under which the mother and child do not receive even half of the Guideline amount for six months after the father expressed his readiness to pay $200 per month, but instead receive nothing at all,[3] seems to me to be so palpably inequitable that the court should adopt it only if no other construction is reasonably possible.

Given the preamble to the Agreement, the parties' pleadings, and their failure to change the June 4, 1986 date, the record does not compel such an inequitable construction. One possible interpretation of the evidence is that the parties inadvertently neglected to change the June date in the preamble and that they contemplated that payments would begin one month after they had reached final agreement on all of the terms. Assuming that this is a plausible construction, it is surely not the *only* plausible one. The retention of the June 4, 1986 date may have been unintentional, but

2. Several studies have found that the economic position of non-custodial parents actually improves after divorce while that the custodial parent and children declines substantially in terms of what their income could provide in relation to their needs even when child support is paid.... Similarly, studies have found that the amounts of support obligation established by courts or administrative tribunals bear little relation to obligors' ability to pay and generally represent a lower percentage of obligors' income the higher that income is.

H.R.Rep. No. 98–527, 98th Cong., 1st Sess. 49 (1983), quoted in *Fitzgerald, supra*, 566 A.2d at 724.

3. We have not been asked to resolve in this appeal the question whether, even if the Agreement were inapplicable, the father would be obligated to pay the mother anything for the relevant period under general principles of child support law.

may also have occurred by design. The allusions in the pleadings to a June agreement may simply have been designed to "identify" the document, as the father now contends, but can also be readily reconciled with the hypothesis that the parties continued to regard June as the month that would trigger the obligation to pay. There is an obvious ambiguity, and the principles of construction to which I have adverted must therefore come into play.

According to the majority, the trial judge "tacitly" resolved any ambiguity in the agreement, and we must therefore defer to her "tacit" finding. I cannot agree. The trial judge issued comprehensive findings of fact and conclusions of law, but she did not address the facts or law critical to the issue presently under discussion.[4] If the judge had found, *e.g.*, that the father was telling the truth, that the mother was lying, and that both had explicitly and knowingly agreed that child support payments were to begin in January 1987, then such deference would of course be appropriate. There is no finding of this kind in the present record, however, and there is no extrinsic evidence that the judge directly confronted or resolved what I perceive to be the decisive issues.

I would reverse the judgment and hold that the mother was entitled to child support payments of $200 per month beginning in July 1986. At the very least, we should remand for more specific findings and for the application to them of more enlightened and equitable principles of law.

---

**4.** I take it that by use of the word "tacitly," my colleagues acknowledge that the judge made no express finding as to the underlying evidentiary facts.