**Cragin G.I. CURTIS, Appellant,**

v.

**Catherine Frazier GORDON
(f/k/a Curtis), Appellee.**

**Nos. 08–FM–541, 08–FM–607.**

District of Columbia Court of Appeals.

Argued June 17, 2009.
Decided Oct. 1, 2009.

Gary A. Stein, Rockville, MD, for appellant.

Eric H. Singer, for appellee.

Before FISHER and OBERLY, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

Appellant, Cragin G.I. Curtis, appeals two trial court judgments resulting from his breach of a Separation, Custody, Support and Property Settlement Agreement (the "Agreement"). He challenges the Agreement on various grounds. He also contends that the trial court erroneously ordered that he obtain a surety bond for reasonable estimated future child support obligations. Appellee commendably concedes a number of issues raised by appellant.[1] Appellee's concessions require a remand to the trial court. In addition, we remand to the trial court to recalculate the arrearages appellant owes under the Agreement based on our conclusion that the Agreement was not fully executed until November 9, 2000, delaying the first payment by one month. In all other respects, we affirm the trial court's orders.

## I. Factual Summary

Appellant and appellee, Catherine Frazier Gordon (f/k/a Curtis), married in 1991 and divorced in 1995. They married again in 1998 and divorced again in 2001. They had one child during their first marriage. Before their 2001 divorce, the parties entered into a Separation, Custody, Support and Property Settlement Agreement. Appellant initialed each page of the Agreement and signed the Agreement before a notary public on October 27, 2000; appellee did not sign the Agreement until November 9 of that same year. Appellant did not have a lawyer when he signed the Agreement. The Agreement was neither incorporated nor merged into the parties' final divorce decree.

The Agreement provides that appellee retain sole custody of the parties' minor child, that appellant pay $1,000 per month in child support, and that appellant pay fifty percent of certain expenses for the child, including expenses related to the child's education, orthodontia, and medical needs. In addition, the Agreement imposes penalties on appellant for late payments of child support[2] and requires that appel-

---

1. Appellee concedes that the post-judgment interest rate of six percent is erroneous and should have been set "at the legal rate"; the trial court failed to subtract travel and camp expenses for the child from the award for educational expenses; and the court failed to subtract the amounts appellee was reim- bursed by insurance for the child's medical expenses.

2. Paragraph 3.4 of the Agreement states, "If the Husband's monthly child support payment is made after the fifteenth (15th) day of any month, for each such late payment the Husband shall owe an additional One Hun-

lee provide documentation of expenses for the child prior to reimbursement for educational and medical expenses.[3]

Around February 2006, appellant received written notice for the first time from appellee that he owed $146,910 in child support arrearages and late fees, as well as $74,954.08 in expenses for their child. Appellant claims that he relied on appellee's statements that appellant should only pay what he could. Appellee, on the other hand, says that appellant misrepresented that he could not pay, which is why she did not pursue him for payments. She claims that she initiated this lawsuit when she realized that he was being dishonest.

Appellant has earned minimal income as a fisherman and a painter.[4] In 2001, he sold a boat and used the proceeds of the sale to pay off loans, claiming that he "didn't see a dime" of the money. In 2003, after the death of both of his parents, appellant inherited a 35 percent ownership interest in a property,[5] as well as $250,000 from his mother's life insurance policy, approximately $60,000 from his father's estate, and interest payments on a loan from his father's estate. Appellant used a portion of his inherited money to renovate the property in order to use the property as a rental,[6] as well as to pay off loans and buy stocks. In addition, appellant received money from the sale of stocks, which he used to purchase three boats,[7] pay off loans, and buy a new generator for one of his boats. Appellant also came to jointly own a home with his sister.[8] Appellant claims that very little money ever went into his bank accounts.

## II. Procedural History

Appellant filed a motion to reduce his child support payments in August 2006. Appellee opposed the motion and filed her own motion to enforce the Agreement. The trial court denied appellant's motion, concluding that "the trial court may only increase the child support amount; but it may not decrease the amount." Appellant

---

dred Dollars ($100.00) for his child support obligation for the next month." In addition, paragraph 3.5 of the Agreement states, "If the Husband fails to make a monthly child support payment, the Husband shall owe the Wife, as child support, an additional One Hundred Dollars ($100.00) per month for each and every month for which he fails to make the payment."

3. Paragraph 3.6(e) of the Agreement states:
 The Wife shall send the Husband copies of all bills documenting the expenses described [above]. Within fifteen (15) days of receiving each bill, the Husband shall pay his Fifty Percent (50%) share of the bill. The Wife has the option of paying the entire bill and seeking reimbursement from the Husband, requiring a direct payment from the Husband to the specific provider, or requiring payment from the Husband to her so she can pay the entire bill at one time. If the Husband fails to pay his Fifty Percent (50%) share of the bill within the time period described above, the Husband shall owe interest to the Wife, based on his Fifty Percent (50%) share of the bill, at the rate of Ten Percent (10%) per annum for every day in which the payment is late.

4. Appellant testified that he earned an income of $5,000 as a fisherman in 2001, $3,000 as a fisherman and a painter in 2002, $5,000 as a fisherman and a painter in 2003, and $5,000 as a fisherman in 2006.

5. According to appellant, the property has no mortgage and is valued at four million dollars.

6. Appellant also claims to have used rental income from the property to further renovate the property.

7. Appellant purchased one of the boats for $300,000 and spent an additional $100,000 on repairs and improvements. Appellant purchased the other two boats for $48,000 and $7,000.

8. According to appellant, the home is valued at approximately $300,000 and has no mortgage.

then filed a notice of appeal in December 2006. We heard oral argument on appellant's appeal and issued an unpublished decision on April 22, 2008, affirming the trial court's judgment and dismissing appellant's request to void the Agreement based on appellee's alleged fraud in procuring the Agreement. *See Curtis v. Curtis*, No. 06–FM–1581, 949 A.2d 617, Mem. Op. & J. (Apr. 22, 2008).

The trial court held a hearing in June 2007, on appellee's motion to enforce the Agreement. The parties then filed proposed findings of fact and conclusions of law. On March 25, 2008, the trial court issued a judgment against appellant, ordering him to pay $486,406.18 plus interest at a rate of six percent, as well as ordering appellant to post a surety bond in the amount of $750,000 and a supersedeas bond if he appealed the judgment. Appellant filed a timely notice of appeal of the March 25 judgment. Appellant also filed an emergency motion to stay enforcement of the judgment and eliminate the supersedeas bond requirement, which the trial court denied on April 21, 2008. The trial court, however, amended its March 25 judgment to correct arithmetic errors, reducing the judgment to $470,052.60 and reducing the surety bond requirement to $500,000. Appellant filed a timely notice of appeal of the April 21 order, and we granted his motion to consolidate the two appeals.

### III. Analysis

 As we have observed, *supra*, the agreement at issue here is neither incorporated nor merged into an order for divorce. There is a "presumption that a child support agreement negotiated between two parents is adequate to meet the child's foreseeable needs, and that at the time of the agreement the best interests of the child were a paramount consideration." *Duffy v. Duffy*, 881 A.2d 630, 638 (D.C. 2005) (quoting *Clark v. Clark*, 638 A.2d

667, 669 (D.C.1994) (internal quotation marks omitted)). "[S]uch agreements are generally enforced in accordance with their terms." *Bracey v. Bracey*, 589 A.2d 415, 416 (D.C.1991). "If the parties disagree on the meaning of their agreement, then the court must interpret it according to principles of contract law and the court's statutory responsibilities.... [W]here the trial court has resolved factual disputes regarding a contract between the parties, this court must treat these factual findings as presumptively correct, unless they are clearly erroneous or unsupported by the record." *Id.* (quoting *Spencer v. Spencer*, 494 A.2d 1279, 1286 (D.C.1985)).

It is within this context that appellant raises the following arguments: (1) paragraph 3.5 of the Agreement is ambiguous and unconscionable because it amounts to an interest rate of 120 percent per annum on his monthly child support obligations under the Agreement; (2) even if the Agreement is enforceable, the trial court erred in awarding child support arrearages to November 1, 2000, because the Agreement was not fully executed until November 9, 2000, when appellee signed the Agreement before a notary public; (3) even if the Agreement is enforceable, the court erroneously calculated arrearages by failing to apply appellant's payments toward his last-in-time unpaid monthly support obligations; and (4) the court erred in denying appellant's defense of laches because appellee did not provide documentation of the child's educational and medical expenses from 2001 onward until 2006. Finally, appellant challenges the trial court's authority to order that he obtain a surety bond in the amount of $500,000 for reasonable estimated future child support obligations. We address each of appellant's arguments in turn.

### A. Ambiguity & Unconscionability

 As to the contention that the penalties imposed under the Agreement amount

to a compounded interest payment of 120 percent per annum and that the penalty provisions are, therefore, (a) ambiguous and (b) unconscionable, we are unable to agree. Appellee contends that both of these arguments are not properly before us because appellant did not explicitly argue ambiguity at the trial level and because appellant never pleaded unconscionability as an affirmative defense. We do not decide these points because appellant is wrong on the merits of each.[9]

■■■ Only where "a contract is reasonably or fairly susceptible to different constructions or interpretations . . . is [it] ambiguous." *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C.2009). "In determining whether a contract is ambiguous, we examine the document on its face, giving the language used its plain meaning." *Id.* As we held in *Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.2000):

> A contract is not ambiguous merely because the parties disagree over its meaning, and courts are enjoined not to create ambiguity where none exists. . . . Rather, a contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. . . . Accordingly, [t]he first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant.

(Internal citations and quotation marks omitted.) Our determination of whether the Agreement was ambiguous is a question of law that we review *de novo*. *1836 S Street Tenants Ass'n, Inc. v. Estate of B. Battle*, 965 A.2d 832, 837 (D.C.2009).

Paragraph 3.4 of the Agreement states: "If the Husband's monthly child support payment is made after the fifteenth (15th) day of any month, for each such late payment the Husband shall owe an additional One Hundred Dollars ($100.00) for his child support obligation for the next month." In addition, paragraph 3.5 of the Agreement provides: "If the Husband fails to make a monthly child support payment, the Husband shall owe the Wife, as child support, an additional One Hundred Dollars ($100.00) per month for each and every month for which he fails to make the payment." Appellant argues that paragraph 3.5 can be interpreted as either (1) a one-time penalty of $100 for each late payment, regardless of how much time passes before appellant pays the arrearage, or (2) a penalty of $100 on each late payment for each month that passes before appellant pays the arrearage. According to appellant, under the second interpretation, after twelve months of non-payment on one monthly child support obligation, he would owe "$2300 ($1000 base support + $100 late fee + $1200 in compounded monthly penalties)" under paragraphs 3.4 and 3.5 of the Agreement, resulting in a "total penalty of 130% (10% for lateness and 120% for non-payment)."

The language in the Agreement belies appellant's argument that paragraph 3.5 is subject to two distinct interpretations. Paragraph 3.5 expressly states that appellant owes $100 *"per month* for *each and every month"* in which he fails to pay. Rather than an "explosive interpretation"

9. We note, however, that appellant argued in his statement of points and authorities in opposition to appellee's motion to enforce the Agreement that the "wording of the Agreement" was "ambiguous" and had "unclear terms that are unenforceable or void for vagueness."

that results in "compound like interest," as appellant argues, the provision applies a penalty to each missed monthly obligation for each month that appellant fails to pay. Appellee correctly notes that adopting appellant's alternative interpretation of these provisions leads to absurd results: "Nonpayment of a month's child support, no matter that it persists for one month or five years, brings about the same $100 late fee[.]" Because "we 'can determine [their] meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, [their] meaning depends,'" the Agreement is not ambiguous. *1836 S Street Tenants Ass'n, supra*, 965 A.2d at 837 (quoting *Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)).

■■■ Next, appellant claims that paragraph 3.5 of the Agreement is unconscionable because it constitutes a "disguised penalty of hundreds of thousands of dollars in excess of his basic support obligation." A party seeking to avoid a contract because of unconscionability must prove two elements: "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C.1983) (quoting *Williams v. Walker–Thomas Furniture Co.*, 121 U.S.App. D.C. 315, 319, 350 F.2d 445, 449 (1965)). "The court determines unconscionability as a matter of law.'" *Id.* at 100 n. 8 (citing *Patterson v. Walker–*

*Thomas Furniture Co.*, 277 A.2d 111, 114 (D.C.1971)).

Even if appellant properly pleaded unconscionability,[10] appellant has failed to demonstrate that he lacked a meaningful choice. Although appellant was not represented by a lawyer, and although he claims that he did not read the Agreement or understand it, appellant initialed every page and signed the agreement before a notary public. Even if appellant did not read the Agreement, he should have done so:

> As a rule, "one who signs a contract has a duty to read it and is obligated according to its terms." *Pers Travel, Inc. v. Canal Square Assocs.*, 804 A.2d 1108, 1110–11 (D.C.2002) (citation omitted). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 157, cmt. b ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms.").

*Tauber v. Quan*, 938 A.2d 724, 732 n. 29 (D.C.2007). *See also* RICHARD A. LORD, 2 WILLISTON ON CONTRACTS § 6:44, at 616 (4th ed. 2007) ("[O]ne who signs a receipt or other document cannot generally avoid it on grounds of a voluntary failure to read it."). In addition, the Agreement contained provisions averring that each party sought independent legal advice, that each party read and understood the Agreement, and that each party entered the Agreement freely and voluntarily. Appellant cannot now claim that he lacked meaningful choice.[11]

---

**10.** Although appellant argued that the late fees were "usurious and unenforceable" and "disguised interest payments," and pleaded the defenses of usury and laches at the trial level, he did not argue that the penalty provisions in the Agreement were unconscionable per se. He did, however, raise the issue of unconscionability in his reply to appellee's proposed findings of fact regarding medical services, submitted to the court after appellee

filed a memorandum regarding medical expenses.

**11.** Appellant's argument likely fails on substantive unconscionability grounds, as well. *See Urban Invs., supra*, 464 A.2d at 100 (defining substantive unconscionability as where "the contract terms were unreasonably advantageous to appellant[ ]"). There is nothing unreasonably advantageous about a provision

## B. Child Support Arrearages

■ Appellant claims that the Agreement was not fully executed until November 9, 2000, when appellee signed the Agreement before a notary public. Therefore, according to appellant, the trial court's award of arrearages that included a payment due on November 1, 2000, plus penalties for late payment, was in error. Appellee counters that the Agreement was fully executed on October 27, 2000, when appellant signed the Agreement before a notary public, because appellant's signing of the Agreement constituted acceptance of the Agreement. Under paragraph 11.9 of the Agreement, which states that the Agreement "shall be effective upon execution by both parties hereto," the Agreement was not effective until both parties had signed the Agreement on November 9. *See generally* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:4, at 37 (4th ed. 1999) ("It is a generally accepted proposition that where the terms of a writing are plain and unambiguous, there is no room for interpretation or construction."). Because the Agreement specifies that appellant's monthly child support payments are not due until "the first day of each month," his first monthly child support payment was not due until December 1, 2000. Accordingly, the trial court's order of arrearages that included a $1,000 payment, plus penalties under paragraphs 3.4 and 3.5 of the Agreement, for November 2000 was "clearly erroneous." *See Bracey, supra,* 589 A.2d at 416.

## C. Application of Payments

■ Although we would normally not consider an argument raised for the first time in a reply brief, *see District of Columbia v. Patterson,* 667 A.2d 1338, 1346 n. 18 (D.C.1995) ("[A]n argument first raised in a reply brief comes too late for appellate consideration."), this court granted appellant's motion for leave to supplement his brief and must now consider whether the trial court erred in accepting appellee's calculation of arrearages where appellant actually made payments to appellee under the Agreement. Appellant argues that any payments made should have been applied to the oldest payment due. "For example, ... if a payment of $1000 were due on December 1, 2000, and [appellant] made a first payment of $1000 on April 24, 2002, then that payment should have been credited to the December 1, 2000, obligation, accruing (in addition to the $100 late fee), a ... penalty for sixteen months for which the payment had not been made, resulting in a ... penalty of $1600." Appellee's calculations, on the other hand, are based on the following: "monies received in addition to any $1,000 monthly payment for any one month would first go to pay down wire transfer costs ...; then any one-time monthly late fee ...; then to any consecutive $100 a month charges for each month of nonpayment that had buildup ...; and then, finally, to last-in-time unpaid core monthly child support obligations."

■ It is a well-established principle that every creditor has the right "to apply the unappropriated monies of his debtor in extinguishment of the debts due him." *District of Columbia v. Aetna Ins. Co.,* 462 A.2d 428, 430 (D.C.1983) (quoting *Gratiot v. United States,* 40 U.S. 336, 370, 15 Pet. 336, 10 L.Ed. 759 (1841)). If a debtor makes a payment without specifying to which debt the creditor should apply the payment, a creditor may apply the payment in a manner chosen by the creditor. *United States v. Kirkpatrick,* 9 Wheat. 720, 22 U.S. 720, 737–38, 6 L.Ed. 199 (1824). *See also Herget Nat'l Bank of*

---

in an agreement that imposes a penalty for each month an individual is delinquent in his or her monthly obligations under the agreement.

*Pekin v. USLife Title Ins. Co. of New York,* 809 F.2d 413, 418 (7th Cir.1987) ("As a general rule, a creditor who holds various accounts of the debtor may, in the absence of direction from the debtor, apply funds to the best advantage of the creditor."); *United States v. Pollack,* 370 F.2d 79, 80 (2d Cir.1966) ("[I]t is the right of the creditor to apply sums received from the debtor or for his account in such fashion as to give the creditor the utmost advantage of such security as the creditor may possess."). There is nothing in the record showing that appellant expressed that his payments be applied in a particular manner. Rather, the evidence shows that appellee informed appellant of the manner in which she planned to apply payments made by appellant in her letter to him of January 30, 2006.[12] In the absence of a contract provision requiring that such payments be allotted as appellant contends, and in the absence of any evidence that appellant requested that his payments be applied in a particular manner, we conclude that the trial court did not err in applying appellee's method for determining the allocation of payments actually made by appellant.[13]

**D. Laches**

■■■ Appellant contends that even if the Agreement is enforceable, the doctrine of laches should apply because appellee did not provide documentation of child care expenses from January 2001 onward until February 2006. Appellee responds that she "was alternatively mislead [sic] by her ex-husband's own, sustained pretense of poverty and scared away by his temper." The trial court concluded in its March 25, 2008, order that appellant had "unclean hands" and that "it was his misrepresentations which prevented [appellee] from timely seeking reimbursement."

■■■ The determination on applicability of a laches defense[14] is a mixed question of law and fact. *American Univ. Park Citizens Ass'n v. Burka,* 400 A.2d 737, 741 (D.C.1979). We will review the trial court's factual determinations for clear error, and we will review whether those facts are sufficient to sustain the defense *de novo. Id.* For a successful defense of laches, the trial court must find "an undue and unexplained delay on the part of one party which works an injustice to the other party." *Amidon v. Amidon,* 280 A.2d 82, 84 (D.C.1971) (internal cita-

---

**12.** In this letter, appellee wrote, "payments that were made [by appellant] ... were applied first to outstanding Paragraph 3.3 and 3.4 fees, then to Paragraph 3.5 additional child support payments and finally to Paragraph 3.1 Base Monthly Child Support."

**13.** Although we are concerned that child support payments not be punitive, *see Mims v. Mims,* 635 A.2d 320, 323 (D.C.1993) ("Child support is not intended to punish the father, but rather to ensure a decent standard of living for the child."), other considerations counsel in favor of our conclusion that the trial court did not err. As noted above, appellant signed the Agreement, which contains penalty provisions that we have determined are not unconscionable. *See Pers Travel, supra,* 804 A.2d at 1110 (" 'One who signs a contract which he had an opportunity to read and understand is bound by its provisions'

unless enforcement of the agreement should be withheld because the terms of the contract are unconscionable.") (quoting *Diamond Housing Corp. v. Robinson,* 257 A.2d 492, 493 (D.C.1969)). Furthermore, absent an express showing that appellant is unable to pay the amounts due and owing under the Agreement, we cannot hold that the trial court's determination as to the application of payments is punitive. *See generally Daka, Inc. v. McCrae,* 839 A.2d 682, 694–95 (D.C.2003) (noting that punitive damages are calculated based on an individual's "ability to pay").

**14.** The defense of laches, if applicable, "may bar an action, in whole or in part, for the collection of arrearages in child or spousal support payments ... under a separation agreement." *Padgett v. Padgett,* 472 A.2d 849, 851 (D.C.1984) (citing *Schmittinger v. Schmittinger,* 404 A.2d 967, 970 (D.C.1979)).

tions omitted). The party asserting the defense has the burden of establishing these elements. *American Univ. Park*, *supra*, 400 A.2d at 740.

We find no error in the trial court's conclusion that there was no unexplained delay on the part of appellee because "it was [appellant's] misrepresentations which prevented [appellee] from timely seeking reimbursement." The trial court noted that appellee explained her delay in presenting this documentation to appellant: she relied on appellant's statements that he could not pay and instituted this suit upon realizing that appellant may have had more money than he told her. We also note that appellee's reliance on appellant's statements that he did not have sufficient money to make these payments was reasonable. *See generally Clark v. Clark*, 535 A.2d 872, 879 (D.C.1987) ("[I]n considering questions of laches, the utmost leniency is manifested by the courts where it appears that the delay is due to the intimate personal relations existing between the parties and the high degree of confidence reposed by one in another.").[15] We affirm the trial court's determination that a laches defense was not appropriate because appellee's delay was neither undue nor unexplained.[16]

Appellant's claim that "[h]e had no notice that after five years he would be harnessed with a crushing retroactive legal obligation" must fall on deaf ears. Appel-lant was well aware of the child's educational and medical expenses paid by appellee, even if he did not receive a written record of those expenses. Appellant knew his child was attending private school and appellee asked him to pay for these expenses in various telephone conversations. In addition, appellant admitted that "for 2001, 2002, and 2003 . . . [appellee] had called . . . a couple of times. We talked, asking for some money, asked me to pay something [of the child's educational and medical expenses]." Similar to *Lasché v. Levin*, 977 A.2d 361, 368 (D.C.2009), where we concluded that "[t]he enforcement of [appellant's] continuing obligation to support his daughter hardly came as a bolt from the blue," appellant knew, or should have known, that he was responsible for a portion of those expenses under the Agreement and was aware of the amounts he was obliged to pay when appellee informed him verbally of the child's educational and medical expenses.

## E. Surety Bond

Appellant next argues that the trial court erred in ordering that appellant secure a surety bond in the amount of $500,000 [17] for his future child support obligation because appellee only requested this relief in her proposed findings of fact and conclusions of law. According to appellant, "[appellee] provided no legal authority for a court to impose a surety bond obligation against future child support ob-

---

15. *Interdonato v. Interdonato*, 521 A.2d 1124, 1137 (D.C.1987), extended this principle beyond merely where the parties are on "friendly terms." *Clark, supra*, 535 A.2d at 879. In *Interdonato*, appellant did not want to cause further strain between her son and appellee, and both appellant and her son relied on appellee for business and legal advice. 521 A.2d at 1137–38. Here, appellee claims that appellant was at times "very angry" and other times "sweet" during their conversations.

16. Even if appellee's delay of five years in providing documentation to appellant was not the result of his claims that he could not pay, appellee's delay may not have been undue or unexplained. *See Nolan v. Nolan*, 568 A.2d 479, 484 n. 7 (D.C.1990) (noting that a twenty-three month delay in a suit for arrearages under a separation agreement was "relatively minimal" and therefore not undue or unexplained) (citing *Schmittinger, supra* note 14, 404 A.2d at 968 n. 2 (five years); *Amidon, supra*, 280 A.2d at 83 (seven years)).

17. The trial court's April 21, 2008, order reduced the surety bond from $750,000 to $500,000 without explanation.

ligations pursuant to a contract which did not require the posting of such a bond." Appellee responds that the Agreement provided sufficient notice to appellant of the possibility that the trial court would order a surety bond for his future child support obligation and that counsel mentioned the issue of a surety bond at trial.

Appellant is incorrect that there is no authority for a court to order a surety bond as a guarantee of future child support obligations pursuant to a contract that did not expressly require the posting of such a bond. Super. Ct. Dom. Rel. R. 54(c) gives the trial court broad discretion to fashion appropriate relief, requiring that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."[18] Furthermore, we have held that "because trial courts are given broad discretion in resolving custody cases . . . , and ought to fashion relief to foster and safeguard a child's best interests," a trial court may impose a bond "upon a parent whose history reflected a capacity for absconding with the child." *Moore v. Moore,* 391 A.2d 762, 769–70 (D.C.1978) (internal citations omitted) (action not unlike appellant's derelictions under the Agreement). *See generally Bowie v. Nicholson,* 705 A.2d 290, 292 (D.C.1998) ("As for child support, a parent has a legal duty to pro-vide support to his or her children if able to do so, and a court may enforce that duty by an appropriate order."); *McGehee v. Maxfield,* 256 A.2d 576, 578 n. 5 (D.C.1969) (awarding child support arrearages although not specifically requested). Although *Moore* involved imposing a bond as related to a father's violation of visitation duties, similar logic applies here. Given appellant's past consistent failures to pay child support in accordance with the Agreement, it was within the court's discretion to order such a surety bond as relief to which appellee was entitled, regardless of whether she asked for that relief.

Appellant also contends that because of his minimal income he is not able "to purchase security against hypothetical future arrearages." An appellant's income, however, is only one factor the court need consider. The court must also consider the child's best interest. *Sollars v. Cully,* 904 A.2d 373, 375 (D.C.2006) ("When assessing child support obligations, we 'look to the children's best interest [which] guarantees that they will be protected.'") (quoting *Nowak v. Trezevant,* 685 A.2d 753, 757–58 (D.C.1996)).[19] Furthermore, the cost to secure a surety bond, typically referred to as a bond premium, is only a percentage of the bond amount, which varies based on individualized factors. *See generally* The Surety & Fidelity Ass'n of

---

18. Even excluding consideration of Super. Ct. Dom. Rel. R. 54(c), paragraph 11.6 of the Agreement, which provides for "the giving of any relief," likely satisfies the requirement under Super. Ct. Dom. Rel. R. 8(a)(3) for "a demand for judgment for the relief or remedy the pleader seeks." *See Lee v. Foote,* 481 A.2d 484, 487 n. 8 (D.C.1984) ("The legal label for the relief sought is not controlling so long as the complaint complies with Super. Ct. Civ. R. 8 to put defendant on notice regarding the nature of the claim.") (internal citation omitted). *See generally Taylor v. District of Columbia Water & Sewer Auth.,* 957 A.2d 45, 50 (D.C.2008) ("This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.") (internal citation omitted).

19. We recognize that ordering an individual, who is truly unable to do so, to post security for reasonable estimated future child support obligations could have negative consequences. *See generally* REPORT OF THE DISTRICT OF COLUMBIA CHILD SUPPORT GUIDELINE COMMISSION, FINAL RECOMMENDATIONS 27 (July 2004) ("[U]ncollectible arrears can discourage payments on current support, as well as continued parental involvement.").

America, "Surety," http://www.surety.org/content.cfm?lid=70&catid=2 (last visited Aug. 28, 2009). Therefore, appellant's claim that such a bond would be unconscionable because he "lacks the resources to purchase security against hypothetical future arrearages" lacks merit.[20]

### F. Additional Arguments

· ■ As we noted above, *supra* note 1, appellee has conceded that the post-judgment interest rate of six percent is erroneous and should have been set "at the legal rate"; the trial court failed to subtract travel and camp expenses for the child from the award for educational expenses; and the court failed to subtract the amounts appellee was reimbursed by insurance for medical expenses for the child. Therefore, we need not consider those arguments.

### IV. Conclusion

We remand to the trial court to recalculate appellant's child support obligation under the Agreement based on appellee's concessions, as well as our conclusion that the Agreement did not enter into force until November 9, 2000. Because the trial court held in abeyance appellee's request for attorney's fees, we also remand for a determination of those fees. In all other respects the order appealed from is affirmed.

*So ordered.*

**20.** Appellant also argues that the requirement that he post a supersedeas bond to stay the trial court's judgment "unreasonably burdens [his] right of appeal and exposes him to a contempt citation if he is unable to qualify for a bond." As appellant acknowledges, the posting of a supersedeas bond is permissive. *See Daime v. Price,* 71 A.2d 611, 612 (D.C. 1950) ("[A]n appealing party is not *required* to file a supersedeas bond; he is *permitted* to do so when he wishes to prevent execution on a judgment pending appeal."); Michael E. Tigar & Jane B. Tigar, Federal Appeals: Jurisdiction and Practice § 6.11, at 375 (3d ed. 1999) ("If a party ordered to post a supersedeas bond does not do so, its appeal may still proceed. It simply lacks protection against execution on the judgment pending appeal."). Therefore, appellant's argument is without merit. We note, however, that "[t]here are constitutional limitations upon a court's power to impose a ruinous supersedeas bond requirement upon a litigant as a condition of staying execution of a judgment during appeal." Tigar & Tigar, *supra,* § 6.11, at 374–75 (citing *In re American President Lines, Inc.,* 250 U.S.App. D.C. 324, 328, 779 F.2d 714, 718 (1985) (holding that "[e]xcessive bond ... is not an acceptable control" for frivolous litigation)).