*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-FM-1333

GEARY SIMON, APPELLANT,

V.

SUMMER SMITH[*], APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DRB-3716-17)

(Hon. Michael K. O'Keefe, Trial Judge)

(Argued June 11, 2020                     Decided April 21, 2022)

*Howard B. Soypher*, with whom *Lisa Fishberg* was on the brief, for appellant.

*Eric T. Werlinger*, with whom *Robert T. Smith* was on the brief, for appellee.

Before GLICKMAN and DEAHL, *Associate Judges*, and RUIZ, *Senior Judge*.

---

[*] At the time this case was filed, appellee Summer Smith's legal name was Summer Smith Simon. As part of the Superior Court's judgment of divorce, the court granted appellee's request that her name be changed to Summer Smith. As that order is uncontested in this appeal, we have recaptioned the appeal as shown above to reflect appellee's legal name.

GLICKMAN, *Associate Judge*: Appellant Geary Simon appeals from the trial court's judgment of absolute divorce between himself and his ex-wife, Summer Smith. He attacks the trial judge's invalidation of two agreements made during the marriage that granted him valuable rights with respect to a residential condominium unit in Arlington, Virginia (hereinafter "the Virginia condo") that Ms. Smith had acquired in her own name before the marriage. Over Mr. Simon's objections, the trial judge held the agreements were unconscionable and ordered him to "cease exercising any control over the property immediately." We affirm.

## I. The Divorce Action

Summer Smith and Geary Simon married in 2006. They have two minor children of the marriage. They separated in 2016, and Smith filed for divorce in October 2017. Her complaint portrayed a difficult marriage in which Simon insisted she not work and "exclusively controlled" their finances and resources, including the management of the Virginia condo. The complaint alleged that this control was in part accomplished through a number of "trusts and other financial arrangements" that Simon presented to Smith as "documents she must sign for their family's and/or children's protection, . . . often with representations about the effect of the documents that were inconsistent with the language of the documents themselves."

The complaint included further allegations that Simon "refused to return to [Smith] her premarital property," identifying specifically the Virginia condo. Smith requested *inter alia* that the court "[a]ward Plaintiff her sole and separate property" and "[d]etermine which property is marital property, value it and distribute it in a manner that is equitable, just and reasonable, in accordance with D.C. Code § 16-910(b)."

Simon did not object to a determination that the Virginia condo was Smith's sole premarital property, but he claimed his wife had assigned him the rights to manage and receive rents from the property. The two agreements at issue in this appeal (a lease and a transfer of property and management rights) were submitted to the court as exhibits during a *pendente lite* hearing extending over several days in March and April of 2018. Ms. Smith claimed they were invalid, testifying she did not recall signing them and first learned of their existence after the parties' separation. During the same hearing, Simon testified that Smith owed him over $170,000 to reimburse him for money he had contributed to the Virginia condo. In its April 2018 order on Smith's request for *pendente lite* support, the court noted that it "did not receive sufficient evidence at this juncture to rule on the validity" of the agreements and that it would "resolve the issue of ownership and/or control of this condo at trial." In the interim, the *pendente lite* order suspended operation of the

agreements and directed that "starting May 1, 2018, Plaintiff shall receive all rental proceeds generated by her condo in Virginia."

Over a four-day trial held on September 10, 11, and 13, and October 25, 2018, the judge heard testimony from Smith and Simon, and from one of Simon's attorneys, Gary Wright. The judge also reviewed the two agreements themselves, photographs of the Virginia condo, and evidence regarding the expenses Simon claimed he had incurred managing the property (for which he claimed the right to place a lien on the condo in order to be reimbursed). The evidence presented at the *pendente lite* hearing was incorporated in the trial record. During the trial, Simon orally objected on procedural grounds to the court's determination of the validity of the challenged agreements in the divorce proceeding, particularly in the absence of two trusts that were parties to the agreements.

Following the trial, the judge issued findings of fact, conclusions of law, and a judgment of absolute divorce. The judgment awarded Smith the Virginia condo as her sole and separate property. It declared the two agreements invalid "because they are unconscionable" under the applicable law, and ordered Simon to "cease exercising any control over the [Virginia condo] immediately." We address the

judge's rulings on those agreements first, as his findings regarding them inform our disposition of the main procedural issues that Simon presents on appeal.

## II. The Validity of the Lease Agreement and the Property Agreement
### A. The Evidence at Trial

Smith purchased the Arlington, Virginia condo in December 2003 with funds she received upon the death of her father. Smith testified that during her subsequent marriage, Simon tried to persuade her to transfer ownership of the condo to one of his trusts or to a family trust. She refused to do so, but she did entrust the management of the Virginia condo to him because she thought that Simon, a real estate professional with far more business acumen than she had, was better suited to the task and that his decisions would be in her best interest. In 2009, Smith also agreed to transfer title to the condo to a trust in her name – the Summer Smith Simon Revocable Trust ("SSS Revocable Trust"). Smith is the settlor, beneficiary, and trustee of this Trust.

Simon testified that he established two other trusts in 2009, the "GSS Revocable Trust" and the "GSS Irrevocable Trust." The trust documents were not introduced in evidence, nor were their terms read into the record. According to Simon, he is the settlor of the GSS Revocable Trust and, with his children, one of its

beneficiaries.[1]  Smith is not a beneficiary.  Simon testified that he was the sole trustee of the GSS Revocable Trust until September 2016, when he claims to have resigned and appointed one of his "professional advisors" as the successor trustee.  As for the GSS Irrevocable Trust, Simon testified it has two trustees, his brother and cousin.[2]  The trusts are referenced in the agreements the trial court held to be invalid.

The first agreement, dated January 1, 2010, is entitled "Residential Lease Agreement" (hereinafter referred to as the "Lease Agreement").  The Lease Agreement names Smith and her SSS Revocable Trust as lessors of the Virginia condo and the GSS Revocable Trust as lessee.  It grants the GSS Revocable Trust a lease on the Virginia condo for a period of ten years, with two five-year extensions of the term available to the Trust at its option, for the fixed rent of $750 per month.  Should the Trust "remain in possession" of the property "after the expiration" of the lease, the agreement provides for continuation of the lease month-to-month.  The Lease Agreement grants the GSS Revocable Trust "an irrevocable right to assign

---

[1] In his testimony at trial Simon identified his two minor children as the beneficiaries of the GSS Revocable Trust, but his brief on appeal to this court states he "named himself trustee and beneficiary" of that Trust.  We come away with the understanding that both Simon and the children were beneficiaries.

[2] However, as described below, one of the agreements at issue in this appeal identifies *Smith* as a trustee of the GSS Irrevocable Trust.  The record does not appear to contain any explanation for this discrepancy.

[the] lease" and states that the Trust may assign the lease "or sublet or grant any concession or license to use the premises" without Smith's consent. The Lease Agreement also includes a purchase option giving the Trust the right to purchase the property at a "fixed and agreed sum" of $290,000 "at any time during the initial [ten-year] term" of the lease (i.e., regardless of the fair market value of the property at the time). (That option was not exercised during the initial term, however, and thus it is undisputed that the Virginia condo remains the premarital property of Smith.) The apparent signatories on the Lease Agreement are Smith, on behalf of both the SSS Revocable Trust and herself individually, and Simon, as trustee on behalf of the GSS Revocable Trust. The Lease Agreement states it is to be "interpreted and enforced pursuant to the laws of The Commonwealth of Virginia."

The second agreement, dated September 2, 2010, is entitled "Agreement Regarding Personal and Real Property" (hereinafter, the "Property Agreement"). The Property Agreement purports to be made "by and between" Geary Simon, the GSS Revocable Trust, and the GSS Irrevocable Trust, and Summer Smith Simon, the SSS Revocable Trust and the SSS Irrevocable Trust. (Smith disclaimed any knowledge of an "irrevocable" trust in her name, and it plays no part in the disputes at issue.) The Property Agreement bears the apparent signatures of Smith and Simon, but solely as individuals. Although the agreement lists the trusts as parties,

it is not signed by anyone on behalf of any of the trusts. The Property Agreement states that it "shall be interpreted and enforced pursuant to the Laws of the District of Columbia."

With the sole exception of the Virginia condo, the Property Agreement transfers to the GSS Revocable Trust "all [Smith's] interest in any and all tangible personal property that [she] may own, including but not limited to [her] household furniture, furnishings, collectibles, clothing, linen, china, silverware, books, jewelry and art."[3]

Although the Property Agreement does not purport to deprive Smith of her ownership of the Virginia condo, it does not leave that property untouched. Instead, the agreement gives Simon, "individually, or through such entity as he determines," the right to manage the Virginia condo on Smith's behalf. It states that "[s]uch management shall include collection of rents or other income generated by the property and payment of all associated expense." After paying Smith "[f]rom the

---

[3] In addition, among other things, the Property Agreement takes note of a term life insurance policy on Simon's person for the benefit of the GSS Irrevocable Trust, "of which [Smith] is the Trustee," and provides that Smith authorizes Simon "to alter, restructure, change or otherwise revise the beneficiary" of the policy. This appears to be the only provision in the agreement pertaining to the GSS Irrevocable Trust.

proceeds of income . . . a sum equivalent to the monthly mortgage for the property," the "excess sum shall be retain[ed] by [Simon] and used for the expenses." But the agreement further provides that "any deficiency between the income and expense of the property shall constitute a reimbursable expense" to Simon that Smith must repay "on demand, or upon sale or other disposition of the property." The Agreement grants Simon an irrevocable power of attorney to record a lien against the property for any "accumulated deficiency," as well as "an assignment of rents to secure the repayment of the deficiency amount."

Smith testified that the Lease Agreement and the Property Agreement were fabricated or forged by her ex-husband and his longtime friend and attorney, Gary Wright. She claimed she never signed them and that she did not understand their terms or implications.[4] The signatures that appear on the agreements as Smith's are reproduced below (the Lease Agreement on the left and the Property Agreement right):

---

[4] As noted below, the trial judge ultimately did not resolve the factual issue of whether Simon's signatures on the Lease Agreement and the Property Agreement were genuine. However, the judge considered it "entirely possible" that Smith may never even have seen the Property Agreement.



Summer Smith Simon        Summer Smith Simon

Smith testified that she had trusted Simon fully to manage and make financial decisions for her regarding the Virginia condo, as he was a real estate professional and her husband, someone she felt would act in her best interest. After he assumed that responsibility, Simon gave her between $750 and $1000 each month out of the rent he collected on the condo, which she referred to as her "allowance" from her husband. Smith testified that she always used the money she received from Simon to pay her mortgage on the Virginia condo, which was approximately $940 per month. Smith also said that after their separation, she attempted to take possession of the Virginia condo by changing its locks. Her husband then changed them again, preventing her from entering the unit.

Simon testified that Smith was present, agreed to, and signed both agreements, and that an attorney, Gary Wright, witnessed the signing of the Lease Agreement and actively represented Smith in negotiating the Property Agreement. Simon maintained that his wife fully understood the terms and implications of both agreements, which he described as being drafted for "estate planning" purposes. When asked by the court why the Lease Agreement's purchase option, in particular,

was necessary between a married couple, Simon responded, "[I]t's a standard lease agreement, I have an option to buy [in] every lease agreement I've ever written in my life . . . and I wanted a fixed price." Simon further testified that he rented the Virginia condo to tenants for around $1,650 a month and covered all of the expenses for maintaining the apartment. He claimed that the cumulative deficiency that Smith owed him under the Property Agreement for his unreimbursed expenses amounted to "about $170,000" at the time of the trial. He estimated that the condo could be sold for $320,000.

Gary Wright's testimony regarding the formation of the two agreements conformed to Simon's. Wright testified that he witnessed the signing of the Lease Agreement but did not represent either party in its negotiation. He claimed that he did represent and advise Smith in negotiating the Property Agreement with Simon's lawyer. Wright acknowledged that he was a longtime friend of Simon and that he and Simon had an "arrangement" under which he had provided various legal services to Simon for nearly fifteen years — an arrangement that was continuing at the time he claimed to have represented Smith in connection with the Property Agreement. Wright also acknowledged that he later filed a lawsuit for the Simon Family Trust *against* Smith in 2016 to evict her from one of Simon's properties after the couple's separation. And in 2014 and 2018, at Simon's request, Wright represented Smith's

Revocable Trust without her knowledge or consent in lawsuits against it by the Arlington Village Townhouse Association for the non-payment of fees assessed against the Virginia condo. Wright said he did so based on his understanding that Simon "had control of the trust that managed the condo."

## B. The Trial Court's Ruling

In rendering judgment, the trial judge began by expressing serious concerns about the credibility of each of the witnesses whose testimony he had heard. Of pertinence here, the judge found Simon's testimony regarding the expenses he incurred in managing the Virginia condo to be "simpl[y] incredible" and "less than forthright."[5] As for Smith, the judge found her somewhat inconsistent testimony

---

[5] As one of several examples of Simon's lack of credibility, the judge cited his "assertion at trial that he has poured $175,000 into Ms. [Smith's] Virginia condo and has operated at a deficit for almost ten years on the property." This testimony was "simpl[y] incredible," the judge explained:

> The photographs admitted as Plaintiff's Exhibit 21 do not reflect a property that has had $175,000 of improvements made to it, further inspection of the documentation of these expenses shows that it is unlikely that Mr. Simon has spent nearly that much on improvements to the property, and finally, it is not credible that someone would invest $175,000 into a property that is only worth about $200,000 and continue to lose money on that property—the rental income for the Virginia condominium is only $1,675 per month, not enough to break even.

regarding whether she signed the Lease Agreement and the Property Agreement "concerning." However, although the judge did not make a finding as to whether Smith actually had signed the agreements, he expressed doubt about it. The judge specifically credited Smith's testimony that she had fully trusted Simon to manage the property in her best interests and did not critically question any documents she may have signed at his behest during the marriage.

The judge was most alarmed by Wright's testimony. He found that Wright's admitted status as Simon's attorney posed a clear conflict of interest to his representation of Smith in connection with the Property Agreement. The court also found that Simon could not authorize Wright to appear as counsel for the SSS Revocable Trust (in the litigation brought by the townhouse association), as Smith was the only trustee with the authority to hire an attorney to represent it, and therefore Wright had held himself out improperly as Smith's attorney without her knowledge or consent. Because of Wright's history of representing Simon and

---

Examining Simon's documentation of his expenditures, the judge found his claim of a $175,000 lien against the Virginia condo for management expenses to be greatly inflated by charges for meals, car payments, and so forth, that had nothing to do with the condo. The judge concluded that "Mr. Simon simply charged anything he wanted as part of the lien against the condo, and expected Ms. [Smith] to be required to reimburse him later." In fact, the judge found, "after subtracting invalid charges to the lien, it appears that there is actually a $16,000 credit on the condo in favor of Mr. Simon. Therefore, there is no lien for which Ms. [Smith] owes Mr. Simon any money."

Smith without regard to ethical rules, the judge "[did] not find Mr. Wright's testimony that he zealously represented [Smith's] interests in negotiating [the Property Agreement] credible."

The judge found the Lease Agreement (which contained a Virginia choice-of-law provision) to be unconscionable, and therefore unenforceable, under either Virginia or District of Columbia law.[6] He found the Property Agreement (which contained a District of Columbia choice-of-law provision) unconscionable and unenforceable under this jurisdiction's law (without considering whether it would reach the same result under Virginia law).

With regard to the Lease Agreement, the judge found that Smith had carried her burden under Virginia law by showing "a gross disparity in the division of assets and clear and convincing evidence of overreaching or oppressive conduct." The terms of the agreement, the judge explained, left Smith with "essentially no control over her only premarital property, and even contemplate[d] Mr. Simon taking it from her in the form of an option to purchase." In addition, the judge found, Smith entered

---

[6] The judge found that, as applied in this case, there was no true conflict between Virginia and District of Columbia law. This is undisputed on appeal.

into the agreement without counsel or bargaining power, trusting in her husband to act in her best interests.[7] For much the same reasons, the judge found both an "absence of a meaningful choice on the part of one party, and unreasonably favorable terms for the other party," which rendered the Lease Agreement unconscionable under D.C. law.[8]

---

[7] As the judge elaborated,

> The agreement was signed at a time when Mr. Simon and Ms. [Smith] were presumably happily married, in 2010, and when they would have had the highest fiduciary relationship between them. Ms. [Smith] trusted Mr. Simon to conduct all business related to the properties properly and to manage her property in a way that would further her interests. When presented with an agreement as to this property, it only makes sense that Ms. [Smith] would have implicitly trusted Mr. Simon, and that Mr. Simon would have known that Ms. [Smith] trusted him, giving her very little bargaining power. Additionally, there is no evidence that any attorneys negotiated this contract on Ms. [Smith's] behalf, nor were there any attorneys present on her behalf when she signed it. In fact, the only parties present were Mr. Simon, the husband with whom she had a fiduciary relationship and a high level of trust, and Mr. Wright, Mr. Simon's long-time friend and attorney in many cases.

[8] As the judge reiterated,

> Ms. [Smith] had very little meaningful choice in signing this agreement—she was presented a contract by her husband, whom she trusted with all of the parties' financial documents and property management, and was told to sign it in the presence of his long-time friend and

As for the Property Agreement, the judge was of the view that it "could be invalid on grounds of fraud," as there was reason to believe Ms. Smith had never signed or even seen the agreement.[9] The judge declined to decide whether the Property Agreement was fraudulent, however, for he concluded that "the agreement is certainly invalid because it is unconscionable." Like the Lease Agreement, the judge explained, the Property Agreement contained terms that unreasonably favored Simon. And Smith did not have a meaningful choice in acceding to the agreement, the judge found, because she was represented by Wright, a friend of Simon's who

---

attorney. Ms. [Smith] had very little bargaining power in this situation because of her trust in Mr. Simon to do the right thing with regard to her property and to manage her property in a way that would align with her best interests.

[9] The judge explained:

[T]here is some evidence of fraud within this document. Mr. Wright testified that he acted as Ms. [Smith's] attorney in negotiating this contract with . . . Mr. Simon's attorney. However, Mr. Wright . . . has falsely acted as Ms. [Smith's] attorney before. He has signed legal documents as her attorney without her knowledge in Virginia. This fact renders Ms. [Smith's] signature on this document suspicious, and the Court questions the validity of the entire agreement. It is entirely possible, due to Mr. Wright's involvement, that Ms. [Smith] may never have seen nor had an opportunity to read this document. Therefore, the Court finds that the Agreement Regarding Personal and Real Property could be invalid on grounds of fraud.

"clearly has a conflict of interest," and because she would have trusted her husband to be acting in her best interest.

Based on the foregoing findings and conclusions of law, the judge ordered Simon in the Judgment of Absolute Divorce to "cease exercising any control over [the Virginia condo] immediately," and not to interfere with Smith's future use of the condo "as she wishes." By its terms, this order applied only to Simon; the judge did not purport to exercise jurisdiction over, or enter judgment or an order against, the GSS Trusts or their trustees.[10]

## C. Discussion

On appeal, Simon maintains that the Property Agreement and the Lease Agreement implemented a fair bargain between himself and Smith. He asserts that she was uninterested in managing the Virginia condo herself, willingly transferred those duties to Simon, and benefitted from receiving rental income on the property for no work on her part while retaining ownership over the property — and that the trial judge therefore erred in finding the agreements unconscionable. In our view,

---

[10] As we discuss below, however, to the extent Simon retained ultimate control of the Trusts as their settlor, the divorce judgment applied to his exercise of control over the Virginia condo through them.

the credited evidence in the record refutes these claims and supports the judge's ruling.

Unconscionability of a contract is ultimately a legal conclusion, dependent on proof and findings of facts supporting such a determination. Thus, while we treat the relevant factual findings as presumptively correct unless they are clearly erroneous or without foundation in the record, we review de novo the trial court's ultimate holding that a contract is unconscionable.[11]

The doctrine of unconscionability works to prevent a party burdened by an oppressive and plainly one-sided contract from being bound by its terms. Under District of Columbia law, a contract is unconscionable, and therefore unenforceable, if there is "an absence of meaningful choice on the part of one of the parties" and the contractual terms are "unreasonably favorable to the other party."[12] "These two elements are often referred to as procedural unconscionability and substantive

---

[11] *See, e.g.*, *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005); *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 100 n.8 (D.C. 1983) ("The court determines unconscionability as a matter of law.").

[12] *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965).

unconscionability," respectively.[13] Virginia courts similarly will find an agreement unconscionable where "oppressive influences affected the agreement to the extent that the process was unfair" (procedural unconscionability) and there was a "gross disparity in the value exchanged" (substantive unconscionability).[14]

Generally, we require that the party seeking to avoid the contract prove both elements.[15] This calls upon the factfinder to make "a strongly fact-dependent inquiry"[16] that is sensitive to context and especially to the relationship between the parties and the power dynamics at play.[17]

Where, as here, the parties to a contract were married at the time the contract was formed, courts scrutinize the agreement "more carefully than an ordinary

---

[13] *Branham*, 464 A.2d at 99.

[14] *Derby v. Derby*, 378 S.E.2d 74, 79 (Va. Ct. App. 1989); *see also Galloway v. Galloway*, 622 S.E.2d 267, 271 (Va. Ct. App. 2005). On the facts of this case, we agree with the trial judge that the issue of the enforceability of the Lease Agreement presents no conflict between Virginia and District law.

[15] *See Curtis v. Gordon*, 980 A.2d 1238, 1244 (D.C. 2009). "[I]n an egregious situation," however, a showing of "one or the other may suffice." *Branham*, 464 A.2d at 99.

[16] *Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1121 (D.C. 2010).

[17] *Walker-Thomas Furniture*, 350 F.2d at 449.

contract," recognizing that spouses owe a fiduciary duty to each other during marriage and often (wisely or not) place a high degree of trust in one another.[18] Because marriage is a confidential relationship in which the parties are not necessarily dealing with each other "at arm's length," it is ripe with opportunity for one spouse to take advantage of the assumed fidelity between them to establish an objectively oppressive agreement.[19]

In our view, the judge's findings in this case are amply supported by the evidence, and they demonstrate that Simon did take unfair advantage of his wife by means of the Lease and Property Agreements. For present purposes, we focus

---

[18] *Burtoff v. Burtoff*, 418 A.2d 1085, 1089 (D.C. 1980); *see also Derby*, 378 S.E.2d at 78 ("Marriage is a confidential relationship of trust imposing the highest fiduciary duty upon the spouses in their intermarital dealings.").

[19] *Burtoff*, 418 A.2d at 1089; *see also Bedrick v. Bedrick*, 17 A.3d 17, 27 (Conn. 2011) ("Because of the nature of the marital relationship, the spouses . . . are certainly less cautious than they would be with an ordinary contracting party. With lessened caution comes greater potential for one spouse to take advantage of the other."); *Derby*, 378 S.E.2d at 79 ("[T]he relationship between husband and wife is not the usual relationship that exists between parties to ordinary commercial contracts. Particularly when the negotiation is between the parties rather than between their lawyers, the relationship creates a situation ripe for subtle overreaching and misrepresentation. Behavior that might not constitute fraud or duress in an arm's-length context may suffice to invalidate a grossly inequitable agreement where the relationship is utilized to overreach or take advantage of a situation in order to achieve an oppressive result.").

primarily on the effects of the agreements on Smith's sole premarital property interest at issue, the Virginia condo.

Turning first to the Lease Agreement, we conclude that whether it is evaluated under the law of the District or that of Virginia, its unconscionability was established. Simon claimed he crafted "a standard lease agreement" like "every lease agreement [he had] ever written in [his] life," containing the fixed purchase price he "wanted." As the judge perceived, however, in doing so Simon took advantage of his unrepresented wife's naiveté and trust (assuming she did know about and sign the agreement) to obtain her assent to an unreasonably one-sided arrangement — a residential lease agreement that, we frankly think, no landlord would make in an arm's length transaction.[20]

The Lease Agreement locked Smith into what was essentially a twenty-year lease of the Virginia condo to Simon's GSS Revocable Trust at a fixed rental rate of

---

[20] *See Derby*, 378 S.E.2d at 81 (procedural unconscionability proved where neither party represented by counsel and wife abused husband's trust and hope they would reunite to convince him to sign agreement with grossly unfair terms to him); *Williams v. Williams*, 508 A.2d 985, 990 (Md. 1986) (separation agreement procedurally unconscionable where husband unrepresented and terms of the agreement were never discussed); *Stoner v. Stoner*, 819 A.2d 529, 533 (Pa. 2003) ("[M]arriage contracts should not be treated as mere 'business deals'" given that the parties "stand in a relation of mutual confidence and trust.").

$750 per month. This was about $200 less than Smith's monthly mortgage payment and less than half the monthly rent paid by the tenants who resided at the condo. (On top of that, the agreement's holdover clause meant that unless Smith was willing to make the maritally challenging choice to evict her own husband from the Virginia condo, he could maintain the lease indefinitely beyond its twenty-year term.) The Lease Agreement also gave the Trust the options to assign the lease or sublet the premises without Smith's consent, and to purchase the Virginia condo during the initial ten-year term at a fixed price below its fair market value. In short, for minimal consideration, the Lease Agreement allowed Simon, through the GSS Revocable Trust (of which he was the sole trustee, at least until 2016) as lessee, to control all rental activity at the unit for at least twenty years without yielding Smith a cent of profit, and to purchase it from her at any time during the first ten years at a bargain price. We agree with the trial judge that these terms were unreasonably favorable to Simon and resulted in a gross disparity in the exchange.

The Property Agreement that followed the Lease Agreement gave Simon personally the right to manage and encumber the Virginia condo with expenses as he alone saw fit, with no control or oversight by Smith (or the trustees of his Trusts, for that matter). Not only did the Property Agreement entitle Simon to collect and retain all income from the condo (and thus keep any and all profits), it also provided

that Smith would be obligated to reimburse Simon if the income from the condo did not cover whatever expenses he unilaterally incurred (a provision susceptible to abuse, and that the trial judge found Simon did abuse by claiming Smith owed him over $170,000 for expenditures that had nothing to do with managing the condo). To ensure his right to that reimbursement, the agreement gave Simon an irrevocable power of attorney to encumber the property with a lien and an assignment of rents. For her (alleged) acquiescence in this arrangement, Smith received only enough money every month to keep the condo's mortgage current. Thus, under the terms of the Property Agreement, the mortgage debt remained in Smith's name, expenses not covered by the income were chargeable to Smith and against her equity, but any benefits of ownership accrued to Simon. In effect, the Property Agreement reduced Smith to an owner only of the liabilities, an owner in name only.[21]

---

[21] In the Property Agreement, Smith also transferred to the GSS Revocable Trust all her interest in any and all tangible personal property she owned. The rationale for that seemingly extraordinary transfer (or an explanation of how it could have been in Smith's interest) is murky at best on the existing record. For present purposes, though, we find it unnecessary to address this aspect of the Property Agreement.

We are satisfied that the trial judge did not err in finding the terms of the Property Agreement to be unreasonably favorable to Simon and substantively unconscionable.[22]

The evidence at trial also supports the judge's determination that the Property Agreement, like the Lease Agreement, was procedurally unconscionable due to the absence of a meaningful choice on the part of Smith. As the judge found, the playing field was not a level one. The attorney who supposedly represented her in the transaction was employed by and aligned with her husband; his primary loyalty was to Simon, not Smith. There is no evidence Wright did anything at all to look out for Smith's interests, to negotiate terms for her benefit or protection, or to ensure that she understood the Property Agreement.[23] (Indeed, the judge considered it "entirely

---

[22] *See, e.g.*, *Williams*, 508 A.2d at 987 (terms of separation agreement so inequitable that they should not be enforced where they "call[ed] for all the assets of any consequence to go to the wife" and "the obligations of supporting those assets to continue to be that of the husband"); *Hale v. Hale*, 539 A.2d 247, 250 (Md. Ct. Spec. App. 1988) (terms of separation agreement substantively unconscionable where they left wife with only four percent of couple's net worth); *Holler v. Holler*, 612 S.E.2d 469, 476-77 (S.C. Ct. App. 2005) (premarital agreement "so oppressive that no reasonable person" would agree to it where agreement required both parties to pay rent and real estate taxes on property owned by husband's mother, any interest in the increase in value of the real estate would accrue to the husband, and agreement provided for no financial support for either spouse, even though wife did not work).

[23] *Compare with Henderson v. Henderson*, 206 A.2d 267, 270 (D.C. 1965) (settlement agreement between divorcing couple made voluntarily and fairly where

possible, due to Mr. Wright's involvement, that Ms. [Smith] may never have seen nor had an opportunity to read this document.") It was surely evident to Simon that Smith, a real estate novice, simply deferred to his greater professional expertise and trusted that her husband and father of her children was acting for their mutual benefit.[24]

Simon's contention — that Smith actually benefitted from the Property and Lease Agreements because they ensured that she kept title to the condo and obtained a monthly income from it without having to manage the condo herself — did not persuade the trial judge and it does not persuade us. We are mindful of the fact that Smith rejected Simon's request that she transfer the Virginia condo to one of his trusts, and we see the Property Agreement and the Lease Agreement as accomplishing Simon's goal indirectly. The agreements leave her with no control over her own property. Under them, she cannot use, rent, or profit from the Virginia condo, she cannot oversee or terminate his management of the property, her title is

---

"[t]he parties were dealing at arm's length through *competent* counsel") (emphasis added).

[24] *See Walker-Thomas Furniture*, 350 F.2d at 449 ("[W]hen a party of little bargaining power, and hence little real choice, signs a[n] . . . unreasonable contract with little or no knowledge of its terms, it is hardly likely that [her] consent, or even an objective manifestation of [her] consent, was ever given to all the terms.").

subject to encumbrance at Simon's "irrevocable" privilege, and her ability to dispose of it at a fair price has been curtailed. The agreements appear to leave Smith with formal title and attendant obligations, but deprive her of virtually every stick in the bundle of rights and benefits associated with ownership. Had the trial court not intervened before the end, in 2020, of the initial ten-year term of the lease, Simon could have exercised the right in the Lease Agreement to purchase the Virginia condo outright during the initial term at a below-market price ($290,000). Moreover, the Property Agreement would have enabled him to set off against that price his unreimbursed expenses incurred in managing the condo (which he claimed came to over $170,000), to satisfy Smith's contractual obligation to reimburse such expenses "on demand, or upon sale or other disposition of the property."

We will not disturb the trial court's conclusion that the arrangements were one-sided and oppressive. We uphold the court's determination that the Property and Lease Agreements are unconscionable.

## III. Jurisdiction and Joinder

We turn now to Simon's main procedural objections to the trial court's determination that the Lease and Property Agreements were invalid. [25]

---

[25] In addition to his main objections, which he raised at trial, Simon makes two procedural arguments for the first time in this appeal. We deal with them summarily in this footnote.

First, Simon argues that because Smith challenged the enforceability of the agreements almost eight years after their creation, her claim is barred by the three-year statute of limitations for actions on a contract. *See* D.C. Code § 12-301(7) (2021 Supp.). The short answer to this argument is that it is doomed by Simon's failure to assert a statute of limitations defense in the trial court. *See Mayo v. Mayo*, 508 A.2d 114, 115-16 (D.C. 1986) ("A statute of limitation is an affirmative defense which must be asserted in a responsive pleading before the trial court. Failure to plead the limitation defense results in a waiver thereof. A statute of limitations defense, once waived (expressly or by nonassertion), may not be raised by a collateral attack upon an adverse judgment or for the first time on appeal." (internal citations omitted)); *accord In re Spinner*, 717 A.2d 362, 366 (D.C. 1998). Allowing a statute of limitations defense to be raised for the first time on appeal is unfair to the opposing party, who may not have made the record it could and would have made had the defense been raised explicitly at trial. In this case, we perceive that Smith might have argued at trial and obtained a ruling that any otherwise applicable statute of limitations did not begin to run when the agreements were allegedly signed in 2010 (or for a long time thereafter), given her professed lack of awareness as to their terms.

Second, Simon maintains Smith failed to plead fraud with particularity in her complaint for divorce. As the trial court's ruling does not rely on fraud as a basis for invalidating the agreements, this argument is irrelevant.

## A. Jurisdiction to Determine the Validity of the Agreements

On the second day of trial, Simon argued, for the first time, that the trial court lacked jurisdiction to determine the validity of the Lease Agreement or the Property Agreement, because Smith had not raised the issue by means of a separate declaratory judgment action or pleading. The judge took this objection under advisement.

On the next trial date, the judge began the proceeding by addressing Simon's objection. The judge noted that, while both parties agreed the Virginia condo was Smith's premarital property, Simon claimed to have used marital funds to improve it and claimed to have a $170,000 lien on it. He concluded that it would be "irresponsible not to address" the validity of the Property and Lease Agreements under the circumstances. The judge informed the parties that another trial date would be set to further and exclusively litigate the validity of the agreements, and determine what, if anything, Simon was owed under them.

When the trial resumed six weeks later, Simon continued to assert what he characterized as a jurisdictional objection to determining the validity of the agreements in the divorce proceeding. The judge again disagreed, concluding that Simon could not undermine the court's "wide latitude" to distribute property in a

divorce action by asserting that any agreement between the parties concerning the Virginia condo would have to be litigated in a different proceeding.

We are not persuaded by Simon's objection. The Lease and Property Agreements were postnuptial agreements concerning the parties' rights and interests in the Virginia condo. The trial court was statutorily empowered and required, "in the absence of a *valid* antenuptial or postnuptial agreement resolving all issues related to the property of the parties," to "assign to each party his or her sole and separate property acquired prior to the marriage," and to "value and distribute all other property and debt accumulated during the marriage that has not been addressed in a *valid* antenuptial or postnuptial agreement . . . in a manner that is equitable, just, and reasonable, after considering all relevant factors."[26] The authority to exercise these powers "in the absence of a valid antenuptial or postnuptial agreement" necessarily includes the authority to determine whether a valid agreement exists in the first place.[27] The trial court's authority to interpret, modify, enforce, or

---

[26] D.C. Code §§ 16-910(a)-(b) (2021 Supp.) (emphases added). "[T]he trial court has considerable discretion and broad authority in distributing marital property as part of a judgment of divorce." *Barnes v. Sherman*, 758 A.2d 936, 939 (D.C. 2000).

[27] This is true even where, as Simon contends, the agreements implicate the rights of a third party (i.e., one or both of his Trusts). As long as the third party's interests are adequately represented, it is an unnecessary "duplication of effort" and

invalidate a disputed antenuptial or postnuptial agreement in an action for divorce has repeatedly been upheld.[28]

Nor are we persuaded by Simon's assertions that he was not on notice that the validity of the Lease and Property Agreements would be examined at trial, and that he was prejudiced in his ability to present evidence on the validity of the agreements by the last-minute inclusion of that issue at trial. As we have recounted, Simon had ample notice that the validity of the agreements would be litigated. Smith's complaint for divorce contained allegations that Simon was exercising control over the Virginia condo with documents of questionable validity and that he "refused to return to [Smith] her premarital property." It expressly requested that the court award her sole and separate property under D.C. Code § 16-910(a) and value and

---

"not good judicial husbandry" to require a separate proceeding to litigate how that third party's rights affect the division of property between the divorcing couple. *Gore v. Gore*, 638 A.2d 672, 676 (D.C. 1994) (internal quotation marks omitted) (holding that a separate proceeding was not required for trial court to impose a constructive trust or other equitable lien on property).

[28] *See, e.g.*, *King v. King*, 579 A.2d 659, 662-63 (D.C. 1990) ("[W]hen parties dispute the meaning of the [postnuptial] agreement, 'the court must interpret it according to principles of contract law and the court's statutory responsibilities.'") (quoting *Spencer v. Spencer*, 494 A.2d 1279, 1286 (D.C. 1985)); *In re Hope*, 231 B.R. 403, 413-14 (Bankr. D.D.C. 1999) ("[D.C. Code §] 16-910 contemplates that courts must adjust and apportion property rights (or determine that a valid agreement exists that already does so) 'in the same proceeding in which the divorce decree is entered.'") (quoting *Argent v. Argent*, 396 F.2d 695, 696 (D.C. Cir. 1968)).

distribute the couple's property under D.C. Code § 16-910(b).  This was sufficient to put Mr. Simon on notice that the validity of the agreements encumbering the premarital property would be an issue for the court to resolve in the divorce action. Lest there be any doubt, the judge stated in his *pendente lite* order, five months before the start of trial, that the court would "resolve the issue of ownership and/or control of this [Virginia] condo at trial."  Where Smith alleged that she wanted the Virginia condo free and clear of the agreements, and where Simon countered during the *pendente lite* hearing and at trial that he had expended significant marital funds and maintained a lien on the Virginia condo, we agree with the trial judge that it would have been "irresponsible not to address" the validity of those agreements.

## B.  The Absence of the GSS Trusts

Simon also argues that because the GSS Revocable Trust and the GSS Irrevocable Trust were parties to the Lease and Property Agreements, the judge abused his discretion by holding those agreements invalid in their absence.  Simon contends the Trusts were "indispensable" parties subject to mandatory joinder under

Superior Court Domestic Relations Rule 19.  For the following reasons, we are not persuaded by this contention.[29]

Simon raised the issue of the Trusts' absence with the trial judge for the first time, orally only, on the final day of trial.  In the extended discussion that followed, the judge questioned whether a showing had been made that the Trusts actually had an interest in the agreements at issue, what the trustees "could . . . possibly add to

---

[29] Simon also asserts the failure to notify the trustees of the divorce action violated the Trusts' rights to due process and the District's Uniform Trust Code, which requires that notice of a judicial proceeding involving a trust "must be given as provided in the applicable rules of civil procedure."  D.C. Code § 19-1301.09(d) (2012 Repl.)).  However, while we accept Simon's standing to assert the rights of the Trusts, he forfeited these claims by failing to raise them in the trial court, *see, e.g.*, *Thornton v. Norwest Bank of Minn.*, 860 A.2d 838, 842 (D.C. 2004) ("It is fundamental that arguments not raised in the trial court are not usually considered on appeal.").  Moreover, as Smith points out, Simon's due process and statutory notice arguments, and his related claim that the trial court lacked jurisdiction over the Trusts' agreements, misapprehend the judgment on appeal.  The trial court did not purport to enter any judgment against the Trusts or their trustees, and the question whether they should have been joined in the divorce action is appropriately addressed by the inquiry we undertake under Rule 19.  That Rule "is designed in no small part to protect" the rights of absent persons "to notice and an opportunity to be heard."  *American Univ. in Dubai v. District of Columbia Educ. Lic. Comm'n* ("*AUD*"), 930 A.2d 200, 208 (D.C. 2007); *see also BAC Home Loans Servicing, LP v. Buggs*, 39 A.3d 1281, 1285 (D.C. 2012) (Rule 19 "does not render the court powerless if an interested party is absent, but grants the court discretion to enter judgment in a fair manner. Thus, failure to join an allegedly indispensable party under Rule 19 does not preclude the trial court from exercising jurisdiction it otherwise has, even where the court's exercise of discretion may have been flawed[.]") (internal footnote and citation omitted).

an evidentiary hearing," and why, if the Trusts really were indispensable, Simon had not brought the trustees in as witnesses or sought to have them intervene, especially when he "had the notice of this hearing for about a month." The judge observed that "the person with the most interest here is Mr. Simon and he's here and he's represented by counsel"; to the extent the trusts had interests in the case, "[their] interest is going to be parallel to Mr. Simon's interest." Simon did not dispute this,[30] nor did he claim he was prejudiced by the absence of the Trusts or a trust representative.

Simon's counsel argued that he had no obligation to notify the Trusts or seek their intervention, as the Trusts were not his clients. He had not spoken with any of the trustees and professed not to know why they had not intervened. He further argued that Simon could not represent the interest of the GSS Revocable Trust himself because he had resigned as a trustee in 2016, and that the trustees could protect the rights of the parties' children (who, along with Simon, were beneficiaries of one of the trusts).

---

[30] Simon's counsel merely declined to agree that the trustees would "necessarily" do whatever Simon wanted them to do, if they thought it would be contrary to their fiduciary obligations to "act independently for the beneficiaries of the trust which they . . . served." As we discuss below, counsel's demurral on this point does not take account of Simon's prerogatives as the settlor of a revocable trust.

Addressing the issue further after a recess, the judge expressed concern that the "documents of the actual formation of these trusts" had not been produced and he had not been able to review them. The Trust documents were relevant, in the judge's view, because:

> the reason we took the break was that [Simon] said that there's party and interests that are not here, and not represented. I would have to have evidence of that, one that there are other parties and two, that they are indispensable parties in the first place . . . .
>
> You're saying we can't go forward because there's parties and interests, maybe and if that's true, then we'll get them in or we'll give them the opportunity to come in.

After further discussion, the judge expressed his continuing uncertainty whether the Trusts existed and had an interest of their own in enforcing the Property and Lease Agreements, but said that if it was shown they did, he would give them an opportunity to appear. Simon did not thereafter enter any trust documents into evidence, though he subsequently testified to the establishment of the Trusts in 2009 and the identities of their trustees and beneficiaries. Nor did anyone purporting to represent either Trust ever materialize to claim an interest in the proceeding. The judge did not address the joinder issue again.

At the conclusion of Simon's testimony, though, the judge questioned him about the Virginia condo. When the judge asked whether Smith could sell the

property, Simon responded, "[s]he can't sell it without selling it subject to *my* lease." (Emphasis added.) Noting also that the condo was security for a bank loan, Simon then volunteered that he would indemnify her and said, "*I* would surrender all interest in the property to [Smith]" if she were willing to put it aside for their sons' college education; "*I'll do it tomorrow* and she doesn't have to pay anything now, she can manage her own property, *I'll* assign the [tenant's] lease . . . to her, she can do whatever she wants to do with that property, its hers, she owns it[.]" (Emphasis added.) In making that declaration, Simon said nothing about the Trusts having any interest in the Virginia condo under the Lease and Property Agreements or having to agree to his relinquishment of the property to Smith.

As the party urging that the case could not proceed without the Trusts, Simon bore "the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence."[31] The trial judge was obligated to evaluate the claim and base his decision

---

[31] *Citizen Band Potawatomi Indian Tribe v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994); *see also Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 242 (D.C. Cir. 1981); *16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8, 12 (D.D.C. 2011). "The moving party may carry its burden by providing affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence." *Id.* (internal quotation marks omitted).

only on the evidence as it "appear[ed] at the time of the proposed joinder."[32] We review a trial court's decision that an absentee need not be joined for abuse of discretion, and reverse "only if we find that its exercise of discretion was clearly against reason and the evidence."[33]

We are not persuaded the trial judge abused his discretion by failing to order that the GSS Trusts be joined as parties. "Joinder of necessary parties is governed by Rule 19, which makes it clear that questions of compulsory joinder are to be resolved on the basis of practical considerations."[34] The question before us comes down to whether Simon demonstrated that the Trusts "claim[ed] an interest relating to the subject of the action and [were] so situated that disposing of the action in

---

[32] *Associated Dry Goods Corp. v. Towers Fin. Corp.*, 920 F.2d 1121, 1124 (2d Cir. 1990).

[33] *Dist. Cablevision Ltd. v. McLean Gardens Condo. Unit Owners' Ass'n*, 621 A.2d 815, 816 (D.C. 1993) (citing *Johnson v. United States*, 398 A.2d 354, 363 (D.C. 1979)).

[34] *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 20 (D.C. 1991) (quotation marks omitted); *accord, District of Columbia v. Am. Univ.*, 2 A.3d 175, 184 (D.C. 2010).

[their] absence [might] . . . as a practical matter impair or impede [their] ability to

protect the interest."[35]  We answer that question in the negative for several reasons.[36]

---

[35]  Dom. Rel. Rule 19(a) provides that "the court must order the joinder of all indispensable persons."  As it does not define what makes a person "indispensable," we look for guidance to the corresponding Rule of Civil Procedure, Civil Rule 19(a)(1).  *See Graves v. Graves*, 51 A.3d 521, 526 & n.9 (D.C. 2012); *Raskauskas*, 589 A.2d at 20 n.2.  Civil Rule 19(a)(1) clarifies that a person whose joinder is feasible must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Only subparagraph (B)(i) is in issue here, as neither party before us credibly claims to have been prejudiced in any manner described in the other subparagraphs of Rule 19(a)(1) by the absence of the GSS Trusts from the proceeding.

[36] As set forth in Dom. Rel. Rule 19(b), when "a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  *See also* Super. Ct. Civ. Rule 19(b).  Because we conclude Rule 19(a) did not require joinder of the GSS Trusts, we do not reach the question of whether dismissal or other ameliorative measures set forth in Rule 19(b) were necessary or appropriate.  *See Associated Dry Goods Corp.*, 920 F.2d at 1123 ("Unless Rule 19(a)'s threshold standard is met, the court need not consider whether dismissal under Rule 19(b) is warranted."); *see also Raskauskas*, 589 A.2d at 20 & n.3.  We emphasize, however, that to "facilitate appellate review," trial judges confronted

First, in point of fact, no representative of the Trusts themselves ever did "claim[] an interest" that might have been endangered due to their absence from the divorce action. That the trustees did not seek to participate further signals the likelihood that they were satisfied with Simon's representation of the Trusts' interests (if, indeed, the Trusts had any real stake in this case at all).[37]

Second, the possibility that the trustees were unaware of the challenge to the Lease and Property Agreements in the divorce action does not suffice to explain away the significance of the trustees' failure to seek to intervene or otherwise protect the Trusts' interests. Given that Simon was the settlor of each Trust and either he or his minor children were the beneficiaries, he had every incentive (and ample time) to alert the trustees if he genuinely believed they had an interest in the Virginia condo their presence was needed to protect. If it is true that neither Simon nor his counsel deemed it necessary to notify the trustees and encourage them to intervene to protect

---

with Rule 19 joinder questions ordinarily are "obliged" to consider motions to dismiss for failure to join an indispensable party under all the criteria set forth in subsections (a) and (b) of Rule 19. *Id.*

[37] *See, e.g.*, *Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980) (absent party's failure to intervene was evidence that, as a practical matter, its interests were not at stake).

the Trusts' interests under the Lease and Purchase Agreements, that only confirms that the Trusts were not necessary parties.

Third, after the trial judge expressed skepticism about the existence and bona fide interests of the Trusts and asked to see Trust documents or other verification, those documents were not proffered, nor did Simon call a trustee or other Trust witness to dispel the judge's doubts.[38]  If he could have satisfied the judge's concerns, it is hard to see why he did not do so unless he thought the Trusts' joinder would have accomplished nothing.

Fourth, as far as the GSS Irrevocable Trust is concerned, the Lease and Property Agreements do not purport to provide it with *any* interest at stake in this case.  The Irrevocable Trust is not a party to the Lease Agreement and has no rights or duties under it.  Although it is named as a party in the Property Agreement, it is

---

[38]  The existence of such legitimate and unresolved doubts about the absent party's existence and interests distinguishes this case from cases such as *Graves*, 51 A.3d at 524-25 (holding that marital home could not be distributed without joining the wife's absent father where it was established that the father was a co-owner of the marital home), and *AUD*, 930 A.2d at 207-08 (holding that trial court abused its discretion in failing to join AUD as a party where it was established that AUD stood to lose its educational license, a property interest, and that no existing party had an interest in defending that license).

not a signatory thereto and it has no rights or duties under that agreement either. The Property Agreement does not purport to bestow or recognize any property interest in the Irrevocable Trust that is at issue in the present case.[39]

Fifth, as for the GSS Revocable Trust, the Lease Agreement did grant it a long-term lease on the Virginia condo, along with an option (now expired) to purchase the condo during the initial ten-year term. But this does not mean the Trust was an indispensable party. Rule 19 compels the joinder of absent persons with an interest in the action in order to avoid any prejudice that may befall them if they cannot assert their interest.[40] The specter of such prejudice dissipates, however, where the absent person's interests do not diverge from, but rather are shared by, the interests of an existing party. When that is so, the absentee's participation is not required, as its interests are adequately represented and protected despite its absence.

---

[39] Rather, as mentioned above, the Property Agreement merely confirms Smith's acquiescence in Simon's power to alter the status of that Trust as the beneficiary of a life insurance policy on his person. That insurance policy is not involved in the present case.

[40] *See Graves*, 51 A.3d at 526; 4 MOORE'S FEDERAL PRACTICE § 19.03[1] (3d ed., 2020 update).

Our decision in *District of Columbia v. American University*[41] is instructive. In that litigation, American University sued the District of Columbia Educational Licensure Commission and the American University in Dubai (AUD) in Superior Court. Granting summary judgment to the plaintiff, the trial court ordered the Commission to revoke both AUD's license and the license of AUD's agent in the District, Mr. Goldstein, who was not a party to the suit. In upholding the revocation of Mr. Goldstein's license, we rejected the District's argument that he was a necessary party under Civil Rule 19(a). Pointing out that AUD "has the most to lose from a holding that the Commission abused its discretion in granting Goldstein an agent's license," we explained that:

> Although Goldstein plainly has an interest in this case, his interests and AUD's interests are for all intents and purposes identical. Therefore, and because AUD adequately represents Goldstein's interest, Goldstein was not a necessary party. *See Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996) ("If the nonparties' interests are adequately represented by a party, the suit will not impede or impair the nonparties' interests, and therefore the nonparties will not be considered 'necessary.'"); *see also Vale Props., Ltd. v. Canterbury Tales, Inc.*, 431 A.2d 11, 15 (D.C. 1981) (trial court may deny motion to intervene under Rule 24(a)(2) "when an existing party seeks the same ultimate objective as the [absent party]"). This is not a case where the absent party "is without a friend in [the] litigation." *Atlantis Dev.*

---

[41] 2 A.3d 175 (D.C. 2010).

*Corp., Ltd. v. United States*, 379 F.2d 818, 825 (5th Cir. 1967).[42]

In the present case, the GSS Revocable Trust certainly did have "a friend" representing and seeking to protect its interests as much as his own in the Virginia condo.  Like AUD in the *American University* litigation, it is Simon here who "has the most to lose" from the order cancelling the lease of the condo.  "[F]or all intents and purposes," Simon's interests and the Trust's interests are identical, and he was an adequate representative of the Trust's interests.  This is so not only because of the management privileges he enjoyed under the Property Agreement, but also — as his trial testimony offering to relinquish the Virginia condo to Smith vividly illustrated — because the trustees of the GSS Revocable Trust owe their allegiance to Simon and are under his direct and total control.

Simon is owed such allegiance and has such control because he was the settlor of the GSS Revocable Trust.  "While a trust is revocable, rights of the beneficiaries

---

[42] *Id.* at 185.  *See also, e.g.*, *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999) ("As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit."); *Ohio Valley Envt'l Coalition v. Bulen*, 429 F.3d 493, 504 (4th Cir. 2005) ("A litigant may serve as a proxy for an absent party if the interests of the two are identical.").

are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor."[43] The trustee of the GSS Revocable Trust is, in effect, Simon's agent, doing his bidding and carrying out his wishes in dealing with the Trust's assets, including its lease of the Virginia condo. As the settlor, Simon has the power to instruct the trustee of the GSS Revocable Trust to relinquish whatever interests it might hold in the Virginia condo or otherwise dispose of that property in accordance with Simon's own obligations or wishes.[44] If Simon exercises that power (in compliance with the trial court's judgment ordering him to "cease exercising any control over the property immediately"), the trustee must obey his commands.[45] Simon thus was the proxy of the GSS Revocable Trust in this litigation; the Trust could not have asserted

---

[43] D.C. Code § 19-1306.03(a) (2012 Repl.).

[44] *See* RESTATEMENT (THIRD) OF TRUSTS § 74(1)(a)(i) (2007) (The trustee of a revocable trust "has a duty to comply with a direction of the settlor even though the direction is contrary to the terms of the trust or the trustee's normal fiduciary duties" so long as that direction is made "in writing in a manner by which the settlor could properly amend or revoke the trust."); *see also id.* § 74(1)(b) (In a revocable trust, "[t]he rights of the [trust] beneficiaries are exercisable by and subject to the control of the settlor."). Thus, it is immaterial that persons other than Simon (i.e., his minor children) are beneficiaries of the GSS Revocable Trust.

[45] Simon's legal control over the GSS Revocable Trust also removes any concern that joinder was necessary to enable the court to "accord complete relief among existing parties" or avoid "leav[ing] an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *See* Super. Ct. Civ. R. 19(a)(1)(A), (B)(2).

interests with respect to the Virginia condo that he himself did not share and seek to protect.

Finally, Simon has identified no interest or argument the GSS Revocable Trust, had it been joined, would have asserted that he was incapable of making himself. And there is no serious dispute that Simon did vigorously assert his and the Trust's interests at trial.[46]

We conclude that, as a practical and legal matter, the absence of the Trusts did not impair or impede the protection of their interests. Simon was their wholly adequate surrogate. The trial court therefore did not abuse its discretion by failing to require that the Trusts be joined or that the action be dismissed or truncated.

---

[46] During oral argument before this court, Simon asserted that the Trusts' representatives could have put on (1) evidence showing that for years, he, Smith, and the Trusts performed under the terms of both agreements and (2) evidence of the value of the Virginia condo. We see no reason why Simon could not have introduced such evidence himself or, as a proponent of the validity of the agreements, might have had no interest in doing so. (In fact, Simon did testify at trial to his performance and appropriate management of the Virginia condo and to its market value.)

**IV.**

For the foregoing reasons, we uphold the Superior Court's invalidation of the Lease and Property agreements as unconscionable, and we affirm the judgment of absolute divorce awarding Smith full custody, control, and ownership over the Virginia condo and ordering Simon to cease exercising any control over it "immediately."